# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JARED JONES,** | : | **Civil No. 1:16-CV-1535** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

In this action, the plaintiff, Jared Jones, appeals a decision issued by an Administrative Law Judge (ALJ) denying Jones's applications for disability insurance benefits (DIB) and supplemental security income (SSI), which were predicated on his asserted serious and assorted mental impairments. Despite an administrative record which showed that Jones had, on multiple occasions within the relevant time period, been hospitalized after episodes of decompensation and suicidal ideation; and despite multiple treating medical professionals having opined in varying degrees to the plaintiff's profound limitations in functioning and expressing informed doubts about the plaintiff's functional abilities, the ALJ

concluded that the plaintiff was not disabled and retained sufficient residual functional capacity to perform a limited range of work subject to very strict limitations.

Review of the ALJ's decision, within the context of a body of medical evidence that reveals that the plaintiff has long suffered from profound mental impairments that episodically became so extreme that they required inpatient hospitalization to stabilize along with drug intervention, it appears that the ALJ selectively focused upon isolated and extremely limited examples contrary evidence to justify rejecting the treating source opinions, and to conclude that the plaintiff was both not credible and not disabled. Some of this evidence was no more than a stray observation that the plaintiff demonstrated a "linear" thought process or on occasion had a "euthymic mood" or affect, but other than to cite to this evidence, the ALJ nowhere explains the significance ascribed to these isolated snippets from the plaintiff's voluminous medical file. Instead, these observations are offered as justification for why the ALJ did not find the plaintiff, his girlfriend, or five treating professionals to be fully credible. Yet, the ALJ cited these random evidentiary shards as proof of an on-going ability to work, without taking into account extended periods of complete disability and without sufficient explanation as to why this fragmentary evidence relied upon by the ALJ supported the ALJ's

conclusion in this regard, and overcame the vast body of contrary proof documenting the plaintiff's profound impairments.

Mindful that the ALJ has the discretion to evaluate and weigh the evidence before her within the governing guidelines set by the Commissioner, we nonetheless find that the ALJ's decision in this case was not supported by substantial evidence, and find that the ALJ failed adequately to explain and justify the rejection of the treating source evidence and her finding that the plaintiff and his girlfriend were incredible in their consistent testimony about the extent of his mental disabilities and their effects upon his daily functioning. In so doing, the ALJ also discounted the informed opinions of multiple treating medical professionals, but offered scant support for doing so other than to assert generally that the opinions were not entirely consistent with the overall record, and then identified isolated and discrete instances showing modest improvement or mitigation of the plaintiff's condition as justification for this outcome. Because we find the ALJ's explanation in support of her adverse decision inadequate, and unsupported by substantial evidence, it will be recommended that the plaintiff's appeal be granted and this matter returned to the Commissioner for further consideration of the plaintiff's application for DIB and SSI.

## II.    BACKGROUND

The plaintiff was born in 1987 and was thus a "younger individual" at all times relevant whose age would not seriously affect his ability to adjust to other work.  (Tr. 316.)  20 C.F.R. §§ 404.1563(c), 416.963(c).  He graduated from high school, has two years of college education, and has worked in the past as a help desk representative.  (Tr. 70-71.)  The plaintiff testified that he quit his last job in February 2011 due to high stress that he experienced when talking to clients, supervisors, and coworkers.  (Tr. 42.)

Medical records reveal that throughout 2010, the plaintiff treated with Valley Behavioral Health Associates for thoughts of self-harm, suicide, and apparent sleep disorders.   (Tr. 434.)   At this time he was taking multiple prescription medications including Abilify, Celexa, Depakote, and Wellbutrin. (Tr. 435.)   Treatment notes from this time indicate that the plaintiff was experiencing episodes of depression and paranoia, along with feelings of anger and impulsive behavior.  (Tr. 434-440.)

The plaintiff entered Holy Spirit Hospital on December 30, 2010, after experiencing depression so severe that it led him to walk out onto a bridge and consider committing suicide.  (Tr. 43; 460.)  Treatment notes indicated bipolar disorder, and that he had previously been admitted at Winchester Hospital in Virginia where he previously lived in 2009.   (Tr. 460.)   His patient history

indicated that he requested admission after having thoughts of running his car into a bridge, cutting or shooting himself, and that he previously had access to a firearm, which had since been removed by his girlfriend. (Tr. 460.) He also informed treating physicians that he had difficulty maintaining his medications because he had lost his job in October, and had increased feelings of hopelessness and irritability. (Tr. 460.) He was discharged a week later, at which point his mood was mildly depressed, with intact memory, normal appearance, good hygiene and without thoughts of suicide, self-harm or harm to others. (Tr. 463-64.) The plaintiff testified that he felt somewhat better for approximately one month, with his depression increasing until his job ended in February 2011. (Tr. 44.) The plaintiff experienced continued depression, anxiety and panic attacks, but acknowledged that these symptoms moderated somewhat because he mostly stayed at home during this time. (Tr. 45.) He was also hospitalized overnight from April 18 until April 19, 2011, for suicidal thoughts or gestures. (Tr. 463-65, 479-98.)

Towards the end of 2012, the plaintiff overdosed on psychiatric medication, which led to hospitalization for 4 days at the Pennsylvania Psychiatric Institute. (Tr. 45; Tr. 582-83.) His GAF score upon admission was 30; upon discharge it was 38. (Tr. 582, 588.) Both of these scores were emblematic of profound psychological impairment. A GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social,

and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 Fed.Appx. 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at

times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR").

During this time, and while his symptoms intensified, he attested that he stopped doing chores around the house, his hygiene suffered, and he felt anxiety when he was not in bed. (Tr. 46.) His daily activities consisted largely of playing games on his phone and watching television. (Tr. 47.) With regards to his anxiety, he testified that it worsened if he knew that he had to leave his house, which he did on occasion. (Tr. 47.) When he was discharged, treatment notes indicated that his mood had improved and he denied having further thoughts of self-harm. (Tr. 583-84.)

The plaintiff sought inpatient treatment again in February 2014 and in March 2014. In February, the plaintiff's medications were adjusted, and this was found to help his mood and decrease his irritability and anger. (Tr. 603.) In what became a pattern of emotional instability for the plaintiff, Jones's progress was fleeting and fragile, however. In March, the plaintiff again overdosed on psychotropic

medications following an argument with his girlfriend, which led him to seek treatment. (Tr. 659.) He stayed in the hospital for 5 days, after which he again denied suicidality and exhibited a euthymic mood and affect. He was diagnosed with depressive disorder. (Tr. 659.)

The plaintiff's testimony offered some insight into his cyclical depressive episodes, and resultant treatment. He stated that he consistently took his medications except when he lost his insurance. (Tr. 49.) In January 2011, for example, the plaintiff attested that he did not fill his Abilify prescription because he knew that once his current prescription ran out he would be unable to afford more.[1] Likewise, records indicate that the plaintiff became noncompliant with his medication regimen while treating in Virginia because of lapses in insurance and lack of funds. (Tr. 435.) One of the plaintiff's treating doctors also noted that the plaintiff lacked insurance and could not afford medication. (Tr. 460.) Treatment notes also reveal the cyclical nature of the plaintiff's depressive condition, noting in May 2011 that even after completing a partial hospitalization program at that time, the plaintiff's depression and irritability had increased. (Tr. 459.)

The plaintiff initially filed a claim for disability benefits on May 25, 2011, alleging an onset date of December 30, 2010. That claim was denied on April 2,

---

[1] In response, the ALJ questioned the plaintiff why he did not ask his doctor for sample medication if he could not afford his prescription. (Tr. 51.) The plaintiff conceded that this might have been a good idea, but did not think of it at the time.

2013, and the plaintiff requested a hearing which was held at the Harrisburg Office of Disability Adjudication and Review before an ALJ. (Tr. 80.) The ALJ issued an unfavorable decision on May 23, 2013. (Tr. 160.) The plaintiff requested review from the Appeals Council, and the Appeals Council remanded the matter on September 25, 2014. (Tr. 178.) This remand was based on new evidence provided by Stevens Mental Health Center which suggested that the plaintiff had no useful ability in interacting with the public and in responding appropriately to changes in the work environment. A new hearing before the ALJ was held on February 20, 2015, who then issued a second unfavorable decision on March 27, 2015. (Tr. 10.) The plaintiff requested review of this decision and the Appeals Council denied the request on June 24, 2016. Thereafter the plaintiff initiated the instant appeal of the ALJ's decision to deny his application.

## III.    **DISCUSSION**

### A.    **Substantial Evidence Review – the Role of the Administrative Law Judge and the Court**

Resolution of the instant social security appeal involves consideration of the respective roles of two adjudicators–the ALJ and this Court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to benefits. To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); <u>see also</u> 20 C.F.R.

§§416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §416.912; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §416.912(f); Mason, 994 F.2d at 1064.

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding. In undertaking this task, this Court applies a specific, well-settled and carefully articulated standard of review. In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Thus, when reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's

decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether a plaintiff is disabled, but whether the Commissioner's finding that the claimant is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the

ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ

as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). In order to aid ALJs in this task of assessing claimant credibility Social Security Rulings and Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529; SSR 96–7p. First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b); SSR 96–7p. During this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c); SSR 96–7p. This includes, but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. § § 404.1529(c)(3). These

factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id. See George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

These same principles apply to an ALJ's credibility determinations as they relate to statements made by a claimant's family and friends, like the fiancé report made in this case. When evaluating such evidence "ALJs should consider 'such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence' when evaluating evidence from non-medical sources such as family or friends." Zirnsak v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014). Moreover:

> To properly evaluate these factors, the ALJ must necessarily make certain credibility determinations, and this court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of

witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony").

Zirnsak v. Colvin, 777 F.3d 607, 612 (3d Cir. 2014).

**B.** **The ALJ's Failure to Adequately Address the Medical Evidence in This Case, Particularly the Multiple Opinions of Treating Physicians, Warrants Remand**

The plaintiff makes three interrelated arguments in support of his appeal. First, he argues that the ALJ erred by not sufficiently crediting the opinions of treating physicians or in not assigning enough weight to their individual opinions, and not applying traditional rules which provide that treating physicians are entitled to great weight, particularly when their opinions are essentially consistent.

Second, the plaintiff argues that the ALJ erred in failing to cite to specific evidence in the record to support his residual functional capacity analysis and findings.

Finally, the plaintiff argues that the ALJ erred in finding that the plaintiff and his girlfriend, Colleen Austin, were not credible, and in failing to support that finding with meaningful evidence in the record.

This report and recommendation focuses on the first of these arguments, which we conclude warrants remand in this case.

The plaintiff refers the Court to the so-called treating physician rule set forth at 20 C.F.R. 404.1527(c)(2), which provides that in general, ALJs are to give more weight to medical opinions from treating sources because those sources are more likely to be medical professionals who are those "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments "and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." Id. In keeping with this regulation, the value of a treating source's opinion will be affected by the length of the treating relationship, the frequency of examination, the nature and extent of the relationship, and the consistency of the opinion with the record as a whole, the specialization of the source. Id. at § 404.1527(c)(2)-(6).

Notably, the regulation also provides that "[w]e will always give good reasons in our notice of determination for the weight we give your treating source's medical opinion." Id. Likewise, the regulation provides that a treating medical opinion will be given more weight the more consistent it is with the record as a whole. 20 C.F.R. § 404.1527(c)(4). The regulation also provides, however, that the ultimate decision regarding a claimant's disability is a matter reserved for the Commissioner, and thus a treating medical source's opinion on this ultimate issue is not entitled to any "special significance". Id. at § 404.1527(d)(3).

The Third Circuit Court of Appeals has explained and amplified the application of this longstanding regulation regarding the weight to be given to treating physicians, noting that "[a] cardinal principle guiding disability eligibility determinations is that the Administrative Law Judge accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). Thus, the opinions of a treating physician are typically entitled to substantial, and sometimes controlling weight. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202 (3d Cir. 2008) (quoting Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)). When an ALJ rejects a treating physician's opinion, the ALJ is obligated to explain reasons for doing so. Fargnoli, 247 F.3d at 43-44 (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000)). In doing so, an ALJ must not make "'speculative inferences from medical reports,'" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) ("[T]he ALJ's credibility judgments . . . alone do not carry the day and override the medical opinion of a treating physician that is supported by the record."). An ALJ may not substitute her lay opinion for the medical opinion of a treating physician, "especially in cases involving mental

disabilities." <u>Rivera v. Astrue</u>, 9 F. Supp. 3d 495, 502 (E.D. Pa. 2014) (citing <u>Morales</u>, 225 F.3d at 319).

In this case, the ALJ was presented with multiple opinions and medical statements from treating sources who had direct involvement in the plaintiff's care, both in the management of his mental health condition and in response to acute episodes of decompensation, and she assigned these opinions limited weight. These opinions came from the plaintiff's mental-health providers at Valley Behavioral Health Associates, Holy Spirit Hospital, and the Pennsylvania Psychiatric Institute, and from four doctors – Drs. Coulter, Schneck, Kaiser, and Fonder – all of whom found at different times that the plaintiff presented with GAF scores of 50 or below. Also discounted was an opinion of a psychologist who provided a mental source statement indicating that the plaintiff had marked and extreme limitations and, in his opinion, was unemployable as a result. The ALJ declined to give these opinions – most of which were substantially consistent and all indicated that the plaintiff had substantial mental-health impairments – significant or controlling weight, but in doing so failed to explain the basis for her decision other than to offer generic assertions that these multiple opinions were somehow not supported by the record as a whole. Then the ALJ endeavored to support this interpretation of the record by highlighting limited, isolated individual statements contained in various places in the record, but in many cases without

explaining what the isolated observations signified, or why she deemed them to be especially probative.

For example, the ALJ points to a statement of Dr. Kaiser on November 6, 2012, which indicated that the plaintiff had "linear thought processes." Other than to cite to this observation, the ALJ does not explain in any way what the observation means in the context of this case, much less why it was deemed sufficiently contrary evidence to cause the plaintiff's multiple treating sources to warrant less significant weight. The ALJ's opinion gives no guidance as to how the plaintiff having a "linear thought process" on one day--November 6, 2012--is somehow adequate to override the substantial evidence in the record that periodically and cyclically indicated that the plaintiff suffered from profound limitations as a result of his mental impairments, or how the fact that he appeared coherent and non-psychotic on one specific day mitigated the examples of longstanding chronic depression, impaired judgment, anxiety, anger that are noted throughout the record over a considerable period of time.

Likewise, the ALJ relied on a statement from Dr. Fonder in March 2014, that the plaintiff exhibited a euthymic mood and affect, but other than to cite to this single observation does not explain why it was sufficient to cast doubt upon the treating physicians' opinions, or that it somehow was a better or more significant indicator of the plaintiff's overall wellbeing, particularly in the context of a case

where the record indicates multiple examples of decompensation, including hospitalization and treatment that followed several episodic instances where the plaintiff's anxiety and depression caused him to consider suicide or self-harm. Indeed, the observation of the plaintiff exhibiting a euthymic mood was made at the end of the plaintiff's most recent hospitalization at Holy Spirit, and is thus consistent with the plaintiff exhibiting a measure of improvement following intensive treatment, which the record indicates is part of a pattern of periodic decompensation, treatment, and some improvement, which was repeated on multiple occasions.

The ALJ also appears to have relied upon an occasion in January of 2011, immediately following a week-long in-patient hospital stay and psychiatric observation, where Dr. Herrada indicated that the plaintiff's depression had decreased to a level 4 on a scale of 1 to 10. The absence of any explanation as to why this treatment note was a better indicator of the plaintiff's mental condition in the context of the overall record makes it especially weak, particularly since it again appears that this treatment note came at the end of a hospital stay that commenced on December 30, 2010, after the plaintiff experienced depression so severe that he walked out onto a bridge and considered jumping from it. (Tr. 43.) That the plaintiff experienced a modest recovery following this hospital stay would seem to be of even less significance given that the record shows he very soon

thereafter experienced yet another bout of depression that gradually worsened until his last job ended in February 2011. Indeed, on April 8, 2011, just three months after Dr. Herrada's treatment note, the plaintiff went back into Holy Spirit Behavioral after he overdosed on Lexapro. (Tr. 479.) The ALJ does not sufficiently justify her reliance on this stray treatment note in the context of the overall medical record.

The record does contain evidence indicating that the plaintiff continued to feel anxiety and to suffer panic attacks, which abated somewhat after he stopped going to work. However, the plaintiff explains this as having resulted from the fact that after leaving his employment he mostly remained confined to his house and did not have to interact with others – a key aspect of the plaintiff's mental impairment that was offered in support of his claim. Furthermore, the emphasis assigned to single observations that followed treatment and hospitalization is further weakened by the fact that the following year, towards the end of 2012, the plaintiff again overdosed on his psychiatric medication, leading to yet another hospitalization at the Pennsylvania Psychiatric Institute. (Tr. 45.) This pattern of episodic decompensation continued into 2014, when the plaintiff was voluntarily admitted to Holy Spirit Hospital again after experiencing thoughts of self-harm, and then two weeks later when he was admitted to Philhaven for additional treatment. Given this longitudinal history, which is marked by periods of extreme

depression and anxiety, the assignment of weight to a single level-4 rating on a scale of depression on a single day provides especially limited evidentiary support to justify discounting the opinions of treating professionals.

The ALJ's inadequate explanation regarding her discounting of multiple opinions from treating sources in the context of the overall record is compounded by an insufficient consideration of the evidence in the record indicating that the plaintiff had been assigned GAF scores below 50 on multiple occasions, while also finding more reliable some GAF scores that came in above 50 without fully explaining the difference in her assessment of this evidence other than to generally state that the higher scores were more consistent with the overall record.

As noted, the record indicates that over a multi-year period, the plaintiff suffered periodic episodes of decompensation, followed by some period of recovery, and that this pattern repeated itself on multiple occasions. Thus, when he was admitted to Holy Spirit Hospital on December 30, 2010, the plaintiff was assessed a GAF score of between 21-30 – an especially low score. (Tr. 461.) When the plaintiff was admitted to the Pennsylvania Psychiatric Institute in November 2012, he was assessed a GAF of 30. (Tr. 588.) When he was discharged, his GAF was assessed at 38. (Tr. 582.) In February 2014, the plaintiff was admitted to Holy Spirit Behavioral for suicidal and homicidal thoughts, and told staff that he had killed a dog and a cat in his neighborhood. (Tr. 600.) He was

assessed a GAF of between 30 and 40 and doctors gave him a guarded prognosis. (Id.) His final diagnosis at this time included a GAF of 55. (Tr. 603.) When he was admitted to Philhaven in March 2014, the plaintiff was adjudged to have a GAF score of 30, and was discharged with a GAF of 55. (Tr. 659.) One of the plaintiff's doctors specifically cautioned that his assignment of a higher GAF should not be misinterpreted as meaning that the patient was capable of working. (Tr. 581.)

It is difficult to read the medical record as indicating anything other than that this cautionary guidance was correct: the plaintiff repeatedly presented to treating centers with an array of mental health impairments, suicidal thoughts, and a frequently low GAF score assessed by treating physicians, which thereafter climbed higher with the benefit of treatment and medication. Rather than engage in a detailed discussion of this evidence, the ALJ does little more than assert that she gave less weight to the lower GAF scores and the opinions of treating physicians as being "not supported by the record as a whole" and because they were "not consistent" with one doctor's opinion that on November 6, 2012, the plaintiff was found to have "linear thought processes." (Tr. 20-21.) In contrast, the ALJ gave greater weight to those GAF scores that were 51 or higher, asserting that "they are supported by the record as a whole and are consistent with Dr. Fonder's observation on March 24, 2014 that the claimant has a "euthymic mood

and affect." (Tr. 21.) This minimal examination of the plaintiff's multiple scores, or to discuss the fact that they adjusted somewhat typically after a period of treatment in a cyclical pattern, was insufficient.

A GAF score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning . . . ." DSM-IV-TR at 32.[2] Courts have consistently found that an ALJ's failure to specifically discuss a GAF score that indicates serious impairments in social or occupational functioning may be cause for remand. See, e.g., Rivera, 9 F. Supp. 3d at 504-05; West v. Astrue, No. 09-2650, 2010 WL 1659712, at *4-6 (E.D. Pa. Apr. 26, 2010); Sweeney v. Comm'r of Soc. Sec., 847 F. Supp. 2d 797, 805 (W.D. Pa. 2012); Metz v. Astrue, No. 10-383, 2010 WL 3719075, at *14 (W.D. Pa. Sept. 17, 2010) (ALJ's determination not supported by substantial evidence where ALJ "did not mention any GAF scores at all and provided no rationale for rejection of this evidence."); Wiggers v. Astrue, No. 09-86, 2010 WL 1904015, at *8-9 (W.D. Pa. May 10, 2010) (GAF scores recognized as acceptable medical evidence that needs to be addressed by ALJ in

---

[2] The Court recognizes that GAF scores are no longer recognized in the most recent edition of the DSM, but we do not find that this means that the ALJ's assessment of the GAF scores in this case is irrelevant to the assessment of the plaintiff's claim for benefits. The ALJ was presented with the GAF scores as part of treating physicians' opinions regarding the plaintiff's level of functioning, and those factors were part of her assessment of the claim of disability, albeit an insufficient one. Courts have recognized that the GAF scale constitutes "acceptable and reliable medical evidence." Rivera, 9 F. Supp. 3d at 504 (citing 65 Fed. Reg. 50746, 50764-65 and Colon v. Barnhart, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006).

making a disability determination); <u>Holmes v. Barnhart</u>, No. 04-5765, 2007 WL 951637, at *11 (E.D. Pa. Mar. 26, 2007) (remand required because of ALJ's failure to acknowledge GAF score of 50); <u>Span ex rel. R.C. v. Barnhart</u>, No. 02-7399, 2004 WL 1535768, at *6-7 (E.D. Pa. May 21, 2004) (finding it was insufficient for ALJ to mention GAF scores without adequately explaining why they were discounted); <u>Escardrille v. Barnhart</u>, 2003 WL 21499999, at *6-7 (E.D. Pa. June 24, 2003) (remanding ALJ's decision because the opinion did not adequately reveal that he gave serious consideration to claimant's GAF score below 50). "In other words, in explaining the rationale for denying disability, the ALJ must demonstrate that he seriously considered and weighed the importance of GAF scores." <u>Rivera</u>, 9 F. Supp. 3d at 505; <u>see also</u> <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 435 (3d Cir. 1999) ("Where competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence . . . ."). Furthermore, and relevant here, "the ALJ may not 'cherry-pick' higher GAF scores in his analysis and ignore GAF scores that may support a disability." <u>Rivera</u>, 9 F. Supp. 3d at 505 (citations omitted). As another district court explained in a decision remanding a case that included multiple GAF scores of 50 or below:

> Because a GAF score constitutes medical evidence accepted and relied upon by a medical source, it should be addressed by an ALJ in making a determination regarding a claimant's disability. Clearly, the five GAF scores of 50 or below received by plaintiff indicate serious symptoms. Yet, after examining the record and

the GAF scores contained therein, the Court finds that while the ALJ provided an explanation regarding the evidence upon which she relied, the ALJ failed to disclose any reasons for not considering the five GAF scores of 50 or below received by plaintiff. For this reason, the Court is unable to conclude that the ALJ's disability determination is supported by substantial evidence, and remands the case for consideration of plaintiff's GAF scores in conjunction with the other mental health evidence in the record and their effect on her [residual functional capacity]. The Court makes clear that it does not find that the GAF scores in question necessarily indicate that plaintiff is "disabled" under the Act. Instead, the Court merely requires that the ALJ, on remand, address the multiple GAF scores received by plaintiff of 50 or below.

West, 2010 WL 1659712, at *6.

It is submitted that the same reasoning should apply in this case. The ALJ's scant discussion regarding the plaintiff's lower GAF scores – some of which were extremely low – and failure to provide any substantial discussion of the reason why the lower scores were deemed entitled to less weight than moderately higher scores that typically followed a period of intensive treatment, was in our judgment erroneous. Aside from giving little more than passing reference to scores below and above 50, the ALJ did little to meaningfully explain why she concluded that the lower scores were not consistent with the overall medical record, or to explain why the higher scores were deemed more consistent, other than to offer generic language and to cite two isolated observations made by doctors following periods of hospitalization or other treatment. We recognize that the failure to discuss GAF

scores in detail does not necessarily mean that the opinion was erroneous or require remand where the ALJ also conducted a thorough analysis of the medical evidence. Rivera, 9 F. Supp. 3d at 506-07; Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *13-14 (W.D. Pa. July 8, 2009). In this case, however, we have found that the ALJ did not conduct the thorough analysis of the medical evidence as required, and thus the failure to meaningfully address the GAF scores and more fulsomely explain why the lower scores were given less weight than the higher scores warrants remand for further consideration and, if necessary, explanation.

The plaintiff has also taken issue with the ALJ's assessment of his and his girlfriend's credibility, and with the ALJ's residual functional capacity assessment. In our judgment, assessment of these claims of error is not necessary at this point because there is a clear basis in the record to warrant remand for further consideration of the medical record evidence. To the extent the plaintiff urges different or further assessment of his RFC, it is submitted that such arguments are more appropriately made in further administrative proceedings which may, if necessary, be reviewed should the ALJ issue another unfavorable decision. Moreover, assessment of the plaintiff's credibility and RFC likely will be influenced by reconsideration of the overall body of medical and opinion evidence, and thus further assessment of those findings is unnecessary here.

## IV.  RECOMMENDATION

For the foregoing reasons it is RECOMMENDED that the plaintiff's appeal of the ALJ's ruling be GRANTED and that this case be REMANDED for further consideration of the plaintiff's application for DIB and SSI.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this 25th day of September 2017.

_s/Martin C. Carlson_

Martin C. Carlson
United States Magistrate Judge